## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDULLAHI MOHAMED FARAH, | |
| *Plaintiff*, | |
| v. | Case No. 1:23-cv-1205 (ACR) |
| GOVERNMENT OF THE REPUBLIC OF SOMALILAND, *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Abdullahi Mohamed Farah, proceeding *pro se*, seeks damages for his father's death, which allegedly occurred at the hands of forces loyal to the Republic of Somaliland, a self-declared breakaway state in East Africa whose legal status the parties vigorously dispute. Plaintiff has sued Somaliland officials and entities under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, and the Torture Victims Protection Act (TVPA), 28 U.S.C. § 1350 note. Defendants have moved to dismiss on various grounds. Dkt. 34-1 (Mot.).

For the following reasons, the Court grants Defendants' Motion and dismisses Plaintiff's Second Amended Complaint without prejudice. In so doing, the Court expresses no view about Somaliland's legal status. Nor does the Court necessarily close the book on this case: it will allow Plaintiff one last opportunity to file a viable pleading.

## I.    BACKGROUND

### A.    Factual Background

The Court begins by describing the central facts, saving some details for the relevant portions of its analysis. Because Plaintiff is proceeding *pro se*, the Court draws these facts from

his operative pleading and his filings in opposition to Defendants' Motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011); *Brown v. Whole Foods Mkt. Grp. Inc*., 789 F.3d 146, 150, 152 (D.C. Cir. 2015).  The Court also relies on material of which it can take judicial notice, such as information on official U.S. government websites.  *See Spence v. U.S. Dep't of Veterans Affs.*, 109 F.4th 531, 539 n.2 (D.C. Cir. 2024); *Arab v. Blinken*, 600 F. Supp. 3d 59, 63 n.1 (D.D.C. 2022).

The Republic of Somaliland is a "self-proclaimed sovereign state" in East Africa composed of territory also claimed by the Federal Republic of Somalia.  *United States v. Ali*, 718 F.3d 929, 933 (D.C. Cir. 2013); *see* U.S. Dep't of State, *2023 Country Reports on Human Rights Practices: Somalia*, https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/somalia [https://perma.cc/7GJ3-EZXS].  Plaintiff alleges that, "[s]ince December 27, 2022, Somaliland Ministry of Defense troops and militias under the command of the Government of the Republic of Somaliland have continuously attacked . . . and indiscriminately shelled the civilian population of [the city of Las Anod] due to [that] population's desire to remain part of Somalia."  Dkt. 31-1 (Compl.) at 14.[1]  Plaintiff further alleges that, on or around December 30, 2022, the Government of the Republic of Somaliland, the Ministry of Defense of Somaliland, Somaliland President Muse Bihi Abdi, and Minister of Defense Abdiqani Mohamoud Aateye "ordered" Somaliland troops "into Las Anod . . . to target, attack, torture, murder, and subjugate the inhabitants . . . deemed to be supporters of Las Anod's unification with . . . Somalia."  *Id.* at 14-15.  "Somalis with United States citizenship or legal residency were deemed by . . . Defendants to be instigators and were specifically targeted."  *Id.* at 15.  The soldiers "stopped [Plaintiff's father] on the streets . . . [and] tortured and summarily executed

---

[1] Citations to docket entries use the continuous ECF page numbering.

[him] . . . for his expressed support for Las Anod['s] unification with Somalia." *Id.* at 14.

Plaintiff also asserts that the Somaliland-based Defendants used the U.S.-based Somaliland

Mission in the United States, Somaliland Support Organization (a nonprofit operated by the

Somaliland Government, Mot. at 7), and their agents "as a command and communication

center," "conspir[ing]" to identify U.S. residents and citizens "suspected to be critics of . . .

Defendants['] actions . . . for harassment, arrest, torture or/and murder upon arrival in areas . . .

controlled by . . . Defendants." Compl. at 15.

### B.    Procedural Background

Plaintiff filed this case in May 2023, naming the Government of the Republic of

Somaliland, the Ministry of Defense, the President, and the Minister as Defendants.  Dkt. 1.

Plaintiff has since twice amended his pleading to add Defendants and allegations.  Dkts. 13, 31-

1.  The operative Second Amended Complaint (to which the Court refers as the "Complaint," for

simplicity's sake) adds five U.S.-based Defendants: the Mission, the Somaliland Support

Organization, and three individuals whom Plaintiff identifies as agents of those entities, Rashid

Nur Absiye, Bashir Goth, and Yassin Meri.[2]  Compl. at 3-4.  Invoking both the ATS and the

TVPA, Plaintiff seeks $1.3 billion in damages.  *Id.* at 12-13.

Defendants moved to dismiss in November 2023.  Mot.  In response, Plaintiff has filed an

Opposition, Dkt. 35 (Opp.); a Supplemental Opposition, Dkt. 39; and a post-argument "Notice of

Clarification and Correction," Dkt. 44.  Defendants have replied to each.  Dkts. 36, 40, 45.  The

Court heard argument on the Motion in June 2024.

---

[2] The parties use inconsistent spellings for Mr. Meri's name.  *Compare, e.g.*, Compl. at 15
("Merri"), *with* Mot. at 7 ("Meri").  The Court uses the more frequent spelling.

## II.    LEGAL STANDARDS

Defendants' Motion seeks dismissal under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6) for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim, respectively.

When a defendant moves to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction.  *E.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Where, as here, "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations," *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000), the Court "assume[s] the truth of all material factual allegations in the complaint and construe[s] the complaint liberally, granting [the] plaintiff the benefit of all inferences that can be derived from the facts alleged," *Am. Nat'l Ins. Co.*, 642 F.3d at 1139 (cleaned up).

A plaintiff confronted with a motion to dismiss under Rule 12(b)(2) must "make a *prima facie* showing of the pertinent jurisdictional facts." *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-57 (D.C. Cir. 2017) (cleaned up).  "Conclusory statements or a bare allegation of conspiracy or agency do not satisfy this burden." *Id.* at 57 (cleaned up).  "When deciding personal jurisdiction without an evidentiary hearing—as here—[a] court must resolve factual disputes in favor of the plaintiff, but it need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts." *Id.* (cleaned up).

To avoid dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (cleaned up).  To meet that standard, a plaintiff's allegations must support a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a

defendant has acted unlawfully." *Id.* (cleaned up). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up). "[T]he Court need not accept inferences drawn by [a] plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the [C]ourt accept legal conclusions cast as factual allegations." *FTC v. Endo Pharms. Inc.*, 82 F.4th 1196, 1203 (D.C. Cir. 2023) (cleaned up).

Because Plaintiff is proceeding *pro se*, the Court must treat him with "solicitude" in applying these standards. *Kim v. United States*, 840 F. Supp. 2d 180, 191 (D.D.C. 2012), *aff'd*, 707 F.3d 335 (D.C. Cir. 2013). In particular, the Court must hold his filings "to less stringent standards than formal pleadings drafted by lawyers" and "consider [his] complaint in light of all filings, including filings responsive to a motion to dismiss." *Brown*, 789 F.3d at 150, 152 (cleaned up). But "even a *pro se* plaintiff must comply with the Federal Rules of Civil Procedure," *Hedrick v. FBI*, 216 F. Supp. 3d 84, 93 (D.D.C. 2016), and must "plead factual matter that permits [the Court] to infer more than the mere possibility of misconduct," *Brown*, 789 F.3d at 150 (cleaned up).

## III.   ANALYSIS

Defendants raise a host of arguments for dismissal. After discussing why the Court need—and, it concludes, should—not address Defendants' arguments based on foreign sovereign or official immunity, the Court explains that it lacks personal jurisdiction over several Defendants. The Court then covers why the remaining ATS and TVPA claims also cannot move forward.

5

A.      The Court Need Not Address Defendants' Immunity Arguments.

As a threshold matter, Defendants argue that the Court lacks jurisdiction over most of Plaintiff's claims because the Somaliland Government, the Ministry, and the Mission "are entitled to [foreign sovereign] immunity under the FSIA" and the individual Defendants "are immune to Plaintiff's ATS claim[s] . . . as foreign government officials."  Mot. at 15, 18. Plaintiff responds that neither form of immunity applies because "Defendants are a secessionist regime . . . not recognized as an independent foreign state by the United States and the United Nations . . . and do not meet the definition of a foreign state [under the FSIA]."  Opp. at 1.  The Court need not resolve this dispute over Somaliland's sovereignty for two independent reasons.

First, although the claimed immunities go to the Court's jurisdiction, neither involves any *constitutional* issues, and the Court has discretion to "address[] the merits where doing so ma[kes] it possible to avoid a doubtful issue of *statutory* jurisdiction."  *Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 728 (D.C. Cir. 2008) (cleaned up).  Foreign sovereign immunity is a statutory issue governed by the FSIA; *Chalabi* itself declined to resolve a claim of immunity under the FSIA because the plaintiff's claims failed on other, nonjurisdictional grounds.  *See id.* at 728-29; *see also Process & Indus. Devs. Ltd. v. Federal Republic of Nigeria*, 962 F.3d 576, 584-86 (D.C. Cir. 2020) (recognizing that, while a district court may not require a foreign sovereign to brief a merits issue before the court resolves a colorable claim of immunity, the court may decide the case on other grounds that the sovereign chooses to brief).  And while foreign official immunity is a common law, rather than statutory, doctrine, *see, e.g.*, *Samantar v. Yousuf*, 560 U.S. 305, 319-25 (2010), the same principle logically applies.  *Chalabi* emphasized the distinction between constitutional and nonconstitutional jurisdictional issues, *see* 543 F.3d at 728-29, and common law immunity, like statutory immunity, falls into the latter category.

Moreover, it would be odd indeed if the Court could decline to address a form of immunity expressly codified by Congress but not one created by judges. *Cf. Samantar*, 560 U.S. at 323 (discussing Congress's "intent to leave [foreign] official immunity outside the scope of the [FSIA]"). The Court thus has discretion to bypass Defendants' immunity claims if their other arguments—even their merits arguments—render the immunity questions moot.

Second, even setting aside that discretion, resolving this case based on Defendants' other arguments does not require the Court to reach any merits issues. "[A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." *Chalabi*, 543 F.3d at 728 (cleaned up). As explained below, most of Plaintiff's claims founder on alternative jurisdictional grounds. The sole claim for which the Court must reach the merits—Plaintiff's TVPA claim against Mr. Goth—is one for which Defendants have not asserted an immunity defense. Mot. at 18 & n.13. So even if the Court could not reach the merits without addressing the immunity defenses, it would not need to do so to dismiss Plaintiff's claims.

Given these alternative grounds for deciding this case, the Court finds it wiser not to wade into the debate over Somaliland's status. *Cf. Blumenthal v. Trump*, 949 F.3d 14, 19 (D.C. Cir. 2020) ("[I]f it is not necessary to decide more, it is necessary not to decide more." (cleaned up)). The legal issues underlying the immunity arguments not only are "difficult" and "doubtful," *Chalabi*, 543 F.3d at 728-29 (cleaned up), but also implicate the "host of sensitive . . . foreign-relations concerns" present in FSIA cases, *Exxon Mobil Corp. v. Corporacion CIMEX, S.A.*, No. 21-7127, 2024 WL 3573507, at *6 (D.C. Cir. July 30, 2024). Indeed, those concerns are if anything more pronounced here than in the usual case; Defendants ask the Court to weigh in not merely on Somaliland's liability in a particular suit but on its very existence. Recognizing that "[t]he better part of valor is discretion," William Shakespeare,

7

*Henry IV, Part 1* act V, sc. 4, l. 118-19 (Claire McEachern ed., 2000), the Court bypasses the immunity issues and focuses instead on Defendants' alternative arguments.

> **B.** **The Court Does Not Have Personal Jurisdiction over the Somaliland Support Organization or Any Individual Defendant Other than Mr. Goth.**

The Somaliland Support Organization and the individual Defendants (other than Mr. Goth) argue that the Court lacks personal jurisdiction over them.[3]  Mot. at 20-23.  The Court agrees.

Some necessary background: In most cases, the personal jurisdiction inquiry examines whether a court sitting in a particular state can exercise jurisdiction over the defendant.  *See, e.g.*, *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013).  To make that determination, a court "must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process" based on the defendant's contacts with that state.  *Id.* (cleaned up); *see* Fed. R. Civ. P. 4(k)(1).  A different inquiry applies, however, if a claim "arises under federal law" and "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction" (either because of restrictive state long-arm statutes or because the defendant lacks sufficient contacts with any one state).  Fed. R. Civ. P. 4(k)(2); *see Lewis v. Mutond*, 62 F.4th 587, 591 (D.C. Cir. 2023).  In such a case, a court may exercise personal jurisdiction over the defendant if doing so is "consistent with" due process requirements based on the defendant's contacts with the United States as a whole.  *Mutond*, 62 F.4th at 591 (quoting Fed. R. Civ. P. 4(k)(2)(B)).  "[A]

---

[3] Defendants initially argued that the Court lacks personal jurisdiction over Mr. Goth as well, Mot. at 21-22, but withdrew that contention at oral argument, Tr. at 60:13-20.  Defendants also assert that the Court lacks personal jurisdiction over the entities purportedly protected by foreign sovereign immunity under the FSIA because, under that statute, the Court has personal jurisdiction only if it has subject matter jurisdiction.  *See* 28 U.S.C. § 1330(a)-(b); Mot. at 21 n.15.  For the reasons discussed above, the Court can—and will—bypass this argument.  *See supra* Section III.A.

court may use [the nationwide inquiry] to confer jurisdiction" if "a defendant does not concede to jurisdiction in another state." *Mwani v. Bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005) (cleaned up).

"[A]part from the scope of the forum"—a specific state or the nation as a whole—the due process analysis in either case is the same.[4]  *Mutond*, 62 F.4th at 591-92 (cleaned up).  Due process "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful contacts, ties, or relations, and requires that individuals have fair warning that a particular activity may subject them to the [forum's] jurisdiction." *Mwani*, 417 F.3d at 11 (cleaned up).  The Court must therefore assess whether the "defendant has sufficient contacts with the [forum] to justify the exercise of personal jurisdiction." *Id.*

In general, "two types" of contacts can support personal jurisdiction.[5]  *Mutond*, 62 F.4th at 591.  First, contacts that "are so continuous and systematic as to render [a defendant] essentially at home in the forum" give rise to "general jurisdiction" over "any and all claims" against that defendant.  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (cleaned up).  "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, . . . the place of incorporation and principal place of business are paradigm bases for general jurisdiction." *Daimler AG v. Bauman*,

---

[4] Technically, the due process requirement in the state-specific framework comes from the Fourteenth Amendment, while the Fifth Amendment controls the nationwide inquiry.  *Mutond*, 62 F.4th at 591.  This distinction does not change the analysis.  *See id.* at 591-92.

[5] Aside from these two usual categories, a party can consent to personal jurisdiction, *see Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 125-27 (2023), and a court may exercise personal jurisdiction over an individual "personally served with process while temporarily in [a s]tate," *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 607, 628 (1990) (plurality opinion).  Plaintiff does not argue—and nothing in his Complaint or briefing suggests—that either option applies here.

571 U.S. 117, 137 (2014) (cleaned up).  Second, more limited contacts may provide a basis for

"specific jurisdiction."  *Goodyear*, 564 U.S. at 919.  "Pleading specific personal jurisdiction . . .

requires demonstrating a close nexus between the [forum], the . . . defendant's conduct, and the

plaintiff's claim."  *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 864 (D.C. Cir. 2022).

"The defendant's contacts must be purposefully directed at the forum," *Mutond*, 62 F.4th at 591

(cleaned up), and "the alleged injuries [must] arise out of or relate to those [contacts],"

*Bernhardt*, 47 F.4th at 864 (cleaned up).

　　　The Court sorts the personal-jurisdiction-contesting Defendants into two groups: (1) the

Somaliland Support Organization and the U.S.-based individuals (other than Mr. Goth) and

(2) the President and the Minister.  It concludes that Plaintiff has not established personal

jurisdiction over either group.

> **1.**　　**The Court does not have personal jurisdiction over the Somaliland Support Organization or the U.S.-based individuals (other than Mr. Goth).**

　　　The Court first assesses whether it has personal jurisdiction over the Somaliland Support

Organization and the U.S.-based individuals (other than Mr. Goth).  To do so, it must first

determine whether to use the state-specific or nationwide personal jurisdiction analysis.  That

determination turns on whether a "defendant is . . . subject to jurisdiction in any state's courts of

general jurisdiction"; if so, the Court must use the state-specific inquiry.  Fed. R. Civ. P. 4(k)(2);

*see Mutond*, 62 F.4th at 591.

　　　The record thus far shows that these Defendants would be subject to general personal

jurisdiction in Virginia, making the state-specific analysis appropriate.  Plaintiff alleges—and

provides exhibits documenting—that the Somaliland Support Organization is a Virginia

corporation with its principal place of business in Virginia.  Compl. at 10; Dkt. 35-3 at 8-14.  The

Organization would therefore be subject to general personal jurisdiction in Virginia.[6]  *See, e.g.*, *Daimler AG*, 571 U.S. at 137 (describing "the place of incorporation and principal place of business [as the] paradigm bases for general jurisdiction" over a corporation (cleaned up)).  The same is true of the individuals, for whom Plaintiff gives Virginia addresses.  *See, e.g.*, *id.* ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . . ." (cleaned up)).

The upshot is that the state-specific analysis applies, and Plaintiff must establish the Court's personal jurisdiction over these Defendants based on their ties to the District of Columbia in particular, rather than to the nation as a whole.  Plaintiff does not describe any such ties in any detail.  Instead, he summarily asserts that the Organization and the U.S.-based individuals "regularly and actively conduct business activities in the District," Opp. at 3, apparently attempting to invoke a provision of the D.C. long-arm statute that authorizes jurisdiction over claims "arising from the [defendant's] . . . transacting any business in the District," D.C. Code § 13-423(a).  Plaintiff's allegation is too broad and "conclusory" to satisfy Plaintiff's burden to "make a *prima facie* showing of the pertinent jurisdictional facts."  *Livnat*, 851 F.3d at 56-57.  In any event, even taking the allegation as true, due process does not permit the Court to exercise either general or specific personal jurisdiction over these Defendants.

First, "regularly and actively conduct[ing] business activities," Opp. at 3, in a forum is insufficient, without more, to confer general personal jurisdiction.  Indeed, the Supreme Court

---

[6] Ordinarily, the exercise of personal jurisdiction must be authorized not only by the Constitution but also by a state's long-arm statute.  *See, e.g.*, *Thompson Hine*, 734 F.3d at 1189.  But the Virginia long-arm statute addresses only specific personal jurisdiction, *see* Va. Code § 8.01-328.1, and the Virginia Supreme Court has held that, as a result, the statute is irrelevant in cases involving general personal jurisdiction, *see Witt v. Reynolds Metals Co.*, 397 S.E.2d 873, 875-76 (Va. 1990) (finding general personal jurisdiction even where long-arm statute did not cover facts).

squarely rejected an argument that a similar formulation—"engag[ing] in a substantial, continuous, and systematic course of business"—supported general personal jurisdiction in *Daimler AG*.  571 U.S. at 137-39.  The Court emphasized that "the inquiry . . . is not whether a [defendant's] in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that [defendant's] affiliations with the [forum] are so continuous and systematic as to render it essentially at home in the forum."  *Id.* at 138-39 (cleaned up).  Without more detailed allegations, the Court cannot say that these Defendants are "essentially at home" in the District.

Second, Plaintiff's bare allegation of "regular[] and active[] . . . business activities" does not show a "close nexus"—or any nexus at all—between his claims and these Defendants' activities in the District.  *Bernhardt*, 47 F.4th at 864.  Since Plaintiff has not established "that [his] alleged injuries arise out of or relate to [these Defendants'] activities" in the District, *id.* (cleaned up), specific jurisdiction is unavailable.  The Court therefore lacks personal jurisdiction over these Defendants.

### 2.    The Court does not have personal jurisdiction over the President or the Minister.

The other two individual Defendants—the President and the Minister—require a different analysis, though it leads ultimately to the same result.  Because these individuals reside in Somaliland, Compl. at 2, and "do[] not concede to jurisdiction in another state," the Court examines their contacts with the United States as a whole to assess its jurisdiction, *Mwani*, 417 F.3d at 11 (cleaned up).

Plaintiff alleges that the President and the Minister "ordered" "soldiers and militia . . . into Las Anod . . . to target, attach, torture, murder, and subjugate the inhabitants . . . deemed to be supporters of Las Anod's unification with the Federal Republic of Somalia."  Compl. at 15. He then seeks to tie these actions to the United States in two ways.  First, he notes his father's

U.S. citizenship.  *Id.*  Second, he alleges that "Somalis with United States citizenship . . . were deemed by . . . Defendants to be instigators and were specifically targeted," and asserts that "the [U.S.-based] Somaliland Mission, the Somaliland Support Organization, and [their] known associates act[ed] as a command-and-control center for . . . Defendants and[,] among other things, provid[ed] the names of Somali-Americans and residents, including . . . Plaintiff's father, deemed to be critics of . . . Defendants[] . . . [for Defendants] to . . . track[], harass[], arrest[], and murder when they arrive[d] in a territory controlled by . . . Defendants."  Dkt. 44 at 1-2; *accord* Compl. at 15.  Plaintiff contends that these connections suffice to confer jurisdiction; the Court disagrees.

The first connection—Plaintiff's father's U.S. citizenship—does not do the trick. "[T]orture alone of an American abroad, unless directed at the United States, is insufficient to satisfy the . . . minimum contacts requirement."  *Mutond*, 62 F.4th at 593 (cleaned up).

The second connection does not fill the gap.  Conclusory allegations of parties' targeting U.S. citizens for mistreatment do not, without supporting detail, establish personal jurisdiction. *See id.* at 593-94.  In *Mutond*, the plaintiff—an American formerly employed as a security advisor to a Democratic Republic of the Congo (DRC) politician—brought TVPA claims against two DRC officials who, he alleged, had "acted in concert to detain and torture" him "because [he was an] American[]," and had similarly targeted other Americans because of their nationality. *Id.* at 589-90, 594.  The officials sought "to extract a false confession that [the plaintiff] was one of many American mercenaries working with the then-DRC President's political opponent to undermine the government."  *Id.* at 590.  The D.C. Circuit concluded that these allegations did not show sufficient contacts by the DRC officials with the United States to support personal jurisdiction.  *See id.* at 593-94.  The court emphasized that the allegations were conclusory and

"merely stat[ed the plaintiff's] theory of specific jurisdiction" without describing any supporting facts "in detail." *Id.* at 594 (cleaned up).  Further, to the extent that the allegations did permit inferences about the defendants' motivations, they showed that "the fact that [the plaintiff was] an American was incidental to the . . . [o]fficials' chief concern": "the DRC's politics," and, in particular, the officials' desire to portray an electoral rival as employing foreign mercenaries. *Id.*

Plaintiff's contention that the President and the Minister targeted U.S. citizens exhibits the same defects.  Plaintiff avers that the President and the Minister "deemed" "Somalis with United States citizenship . . . to be instigators," Compl. at 15, but provides no supporting details.  Nor does he offer any specific allegations to describe the President and the Minister's purported coordination with the U.S.-based Defendants to identify and target Somali Americans.  As a result, like the allegations in *Mutond*, Plaintiff's conclusory assertions "merely stat[e] his theory of specific jurisdiction" without the necessary factual support.  62 F.4th at 594 (cleaned up).  And, again as in *Mutond*, insofar as Plaintiff's allegations support any conclusions about Defendants' aims, they suggest that his father's nationality "was incidental to [Defendants'] chief concern": regional politics. *Id.*  Plaintiff himself asserts that Defendants were worried about local "instigators" and that soldiers targeted his father because of "his [father's] expressed support for Las Anod unification with Somalia."  Compl. at 14-15.  So Plaintiff's purported U.S. connections do not authorize the exercise of personal jurisdiction over the President or the Minister.

Plaintiff points to several exhibits that, in his view, lend credibility to his targeting theory, but none allow the Court to "reasonably infer . . . purposeful availment of the United States" by the President or the Minister.  *Mutond*, 62 F.4th at 595 (cleaned up).  Plaintiff first cites a series of 2023 Twitter posts from an account purportedly affiliated with the Mission.  Dkt.

35-5.  The tweets praise the Somaliland Government's handling of the conflict in Las Anod, describe the poster's communications with field commanders, reference the capture of a U.S.-citizen combatant by Somaliland forces, and assert that U.S.-based actors are "flaming the situation."  *See id.*  Defendants dispute whether the account has any formal affiliation with the Mission, Dkt. 36 at 15-16, but, in any event, the tweets do not make Plaintiff's targeting theory plausible: references on Twitter to the role of U.S. citizens or residents in the conflict in Somaliland do not demonstrate the existence of a large-scale surveillance operation.

The other exhibits Plaintiff proffers fare no better.  He provides a 2012 news article, allegedly from the Mission's website, that asserts that two U.S.-citizen "warlords" had led militias in Somaliland against Somaliland Government forces, resulting in "more than 40" deaths.  Dkt. 35-7 at 2.  The Mission's posting an article about newsworthy events involving individuals with U.S. ties does not support a reasonable inference that the U.S.-based Defendants were covertly targeting Somali Americans en masse even in 2012—let alone at the time of Plaintiff's father's death roughly a decade later.  Nor does the other article Plaintiff cites, which describes accusations by a "Somaliland lawmaker" that the President's son "targeted" a British-Somali journalist for detention and torture on her arrival in Somaliland in 2023.  Dkt. 35-8 at 2-3.  Given that the article does not mention the United States, U.S. citizens, or any of the U.S.-based Defendants and involves allegations about actions by the President's son (not the President himself) against a single individual in Somaliland, it does not push Plaintiff's targeting theory "across the line from conceivable to plausible."  *Iqbal*, 556 U.S. at 680 (cleaned up); *cf. Mutond*, 62 F.4th at 594-95 (explaining why news articles did not support plaintiff's personal jurisdiction theory).  The Court cannot exercise personal jurisdiction over the President or the Minister.

**3.      The Court will dismiss, rather than transfer, Plaintiff's claims against those Defendants over whom the Court lacks personal jurisdiction.**

Although Plaintiff does not raise the possibility, the Court recognizes that it must transfer Plaintiff's claims against any Defendants over whom it lacks personal jurisdiction "to any other . . . court . . . in which the action . . . could have been brought" if doing so "is in the interest of justice." 28 U.S.C. § 1631.  For several reasons, the Court concludes that transfer is not warranted here.

First, several of Plaintiff's claims fall outside the jurisdiction of *any* federal court, leaving the Court with nowhere to transfer them.  No federal court would have personal jurisdiction over the President and the Minister.  *See supra* Section III.B.2.  And, as explained below, Plaintiff's allegations in support of his ATS claims do not overcome the presumption against extraterritoriality, and thus those claims fall outside any federal court's subject matter jurisdiction.[7]  *See infra* Section III.C.

Second, the "serious substantive defects" with Plaintiff's TVPA claims against the U.S.-based Defendants other than Mr. Goth mean that transfer would not be "in the interest of justice." *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 785 (D.C. Cir. 1983).  In particular, the TVPA claims against these Defendants "would likely face dismissal . . . for failure to state a claim" for the same reasons discussed below in connection with Mr. Goth.  *Roman-Salgado v. Holder*, 730 F. Supp. 2d 126, 131 (D.D.C. 2010); *see infra* Section III.D.  And the TVPA claim against the Somaliland Support Organization would independently fail because the TVPA

_____

[7] Even if the presumption against extraterritoriality were a merits issue, rather than a jurisdictional one, transfer would not be "in the interest of justice" because the case "would likely face dismissal . . . for failure to state a claim." *Roman-Salgado v. Holder*, 730 F. Supp. 2d 126, 131 (D.D.C. 2010); *accord Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 785 (D.C. Cir. 1983) ("[T]he district court was not obliged to transfer this action . . . because [the plaintiff's] claims suffer from serious substantive defects.").

"authorizes liability solely against natural persons."  *Mohamed v. Palestinian Auth.*, 566 U.S.

449, 456, 461 (2012); *see infra* Section III.D.  Dismissal, rather than transfer, is therefore

appropriate.[8]

### C.    Plaintiff's ATS Claims Do Not Overcome the Presumption Against Extraterritoriality.

The Court turns next to Plaintiff's ATS claims against the remaining Defendants.  The

ATS grants district courts "original jurisdiction of any civil action by an alien for a tort only,

committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.

"Although this jurisdictional statute does not create a cause of action, . . . courts may exercise

common-law authority under this statute to create private rights of action in very limited

circumstances."  *Nestlé USA, Inc. v. Doe*, 593 U.S. 628, 631 (2021).  But "[t]he Supreme Court

has established that the 'presumption against extraterritoriality' governs the ATS's reach."

*Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 514 (D.C. Cir. 2018)

(quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 124 (2013)).  "ATS claims

involving extraterritorial activity can displace the presumption only if the claims touch and

concern the territory of the United States with sufficient force."  *Id.* (cleaned up); *see Nestlé*, 593

U.S. at 634 (examining factual allegations in complaint to determine whether claims cleared this

hurdle).  The Supreme Court has "treated extraterritoriality in the ATS context as a jurisdictional

matter."  *Kaplan*, 896 F.3d at 516; *accord Mastafa v. Chevron Corp.*, 770 F.3d 170, 179 (3d Cir.

2014) (treating presumption against exterritoriality as jurisdictional in ATS context); *Al Shimari*

*v. CACI Premier Tech., Inc.*, 758 F.3d 516, 528 (4th Cir. 2014) (same).

---

[8] Plaintiff has neither requested jurisdictional discovery nor provided any "good faith" reason to believe that such discovery would fill in the gaps in his jurisdictional allegations without devolving into a "fishing expedition."  *Mutond*, 62 F.4th at 596.  The Court thus has no basis to order discovery before ruling on Defendants' Motion.

Plaintiff does not argue that his father's U.S. citizenship creates a sufficient domestic connection to overcome the presumption, and with good reason.  The extraterritoriality analysis focuses on the *location* of the conduct at issue, *see, e.g.*, *Nestlé*, 593 U.S. at 634, and a plaintiff must accordingly establish that her claims "touch and concern the *territory* of the United States," *Kaplan*, 896 F.3d at 514 (cleaned up).  Consistent with that requirement, the D.C. Circuit has held, albeit in the context of another statute, that the U.S. citizenship of a party affected by extraterritorial conduct does not "make [that] conduct domestic."  *Garvey v. Admin. Rev. Bd.*, 56 F.4th 110, 128 (D.C. Cir. 2022).  Plaintiff must point to conduct that took place in the United States.

To meet that burden, Plaintiff returns to his contention that the U.S.-based Defendants "act[ed] as a command-and-control center for . . . Defendants and[,] among other things, provid[ed] the names of Somali-Americans and residents, including . . . Plaintiff's father, deemed to be critics of . . . Defendants[] . . . [for Defendants] to . . . track[], harass[], arrest[], and murder when they arrive[d] in a territory controlled by . . . Defendants."  Dkt. 44 at 1-2; *accord* Compl. at 15 (alleging that Defendants "conspire[d]," with U.S.-based Defendants "aid[ing] and abet[ting]" Defendants overseas).  Plaintiff does not meaningfully elaborate on this claim (for instance, by specifying when, where, or how Defendants communicated), and the Court has already explained why Plaintiff's exhibits do not plausibly support this targeting theory.  *See supra* Section III.B.2.  The result is a "naked assertion[] devoid of further factual enhancement" that the Court need not accept as true even at the motion-to-dismiss stage.  *Iqbal*, 556 U.S. at 678 (cleaned up); *accord, e.g.*, *Air Excursions LLC v. Yellen*, 66 F.4th 272, 279 (D.C. Cir. 2023); *see also Endo Pharms.*, 82 F.4th at 1203 (explaining that "the Court need not accept inferences

drawn by [P]laintiff if those inferences are not supported by the facts set out in the complaint"
(cleaned up)).

Indeed, Plaintiff's assertion is essentially a marriage of the allegations that the Supreme
Court and the D.C. Circuit declined to accept as true in *Bell Atlantic Corp. v. Twombly*, 550 U.S.
544 (2007), and *Kareem v. Haspel*, 986 F.3d 859 (D.C. Cir. 2021), respectively.  In *Twombly*—
an antitrust case—the plaintiffs bore the burden of proving, among other things, that the
defendants had entered into "an agreement" in restraint of trade.  550 U.S. at 553 (cleaned up).
Accordingly, the Court refused to credit the plaintiffs' allegation that the defendants "ha[d]
entered into a . . . conspiracy to prevent competitive entry . . . and ha[d] agreed not to compete
with one another," reasoning that this assertion was simply a "legal conclusion[]."  550 U.S. at
564-65.  The Court then held that the complaint's well-pleaded factual allegations did not
"plausibl[y] suggest[]" a conspiracy.  *Id.* at 566.  In *Kareem*, the D.C. Circuit did not assume the
truth of the plaintiff's "alleg[ation, made] upon information and belief[,] that the U.S.
government had designated [the plaintiff] as a terrorist target approved for lethal force," and
concluded that the complaint's concrete factual allegations did not support a reasonable inference
of the purported terrorist designation.  986 F.3d at 866; *see id.* at 865-69.

Here, taking a page from the *Twombly* plaintiffs' book, Plaintiff—who must, as a legal
matter, demonstrate some connection between his father's death and U.S. territory—alleges a
"conspir[acy]" involving the U.S.-based Defendants.  Compl. at 15.  Much as in *Kareem*,
meanwhile, he asserts generally that government actors targeted an individual—here, his father.
And like the plaintiffs in both cases, he does not provide any specifics in support of his
conclusory allegation.  The Court therefore declines to assume the truth of Plaintiff's conclusory
conspiracy allegation.  And without that allegation, there is nothing in his filings to overcome the

presumption against extraterritoriality, dooming the ATS claims, which the Court must dismiss

for lack of jurisdiction.[9]

### D.      Plaintiff's TVPA Claims Also Fail.

That leaves Plaintiff's TVPA claims against the Government, the Ministry, the Mission,

and Mr. Goth.  Those claims also fail.

First, the claims against the Government, the Ministry, and the Mission are untenable

because, as the Supreme Court unanimously held in *Mohamed v. Palestinian Authority*, 566 U.S.

449 (2012), the TVPA "authorizes liability solely against natural persons" and does not authorize

suits against "organizations, sovereign or not."  *Id.* at 456, 461; *see* 28 U.S.C. § 1350 note § 2(a)

(authorizing suit against "[a]n individual").  Defendants raised this point in their Motion, Mot. at

29-30, and Plaintiff did not respond either in his filings or at oral argument.  *See* Dkts. 35, 39, 44;

Tr. at 43:11-45:2.  Given how clearly Supreme Court precedent forecloses liability—and

Plaintiff's lack of any argument in response to that precedent—Plaintiff's TVPA claims against

these Defendants are so "obviously without merit" that the Court lacks jurisdiction to hear them.

*Shapiro v. McManus*, 577 U.S. 39, 46 (2015) (cleaned up); *see also Steel Co. v. Citizens for a*

---

[9] If Plaintiff means to argue that Mr. Goth and the Mission committed a distinct tort by aiding
and abetting the alleged overseas torts through their actions on American soil, that claim would,
if nothing else, fail on the merits because Plaintiff has provided no concrete factual allegations to
support his conclusory assertions of a conspiracy to target Somali Americans.  The Court
therefore need not decide whether courts may "create an aiding-and-abetting cause of action
under the ATS."  *Nestlé*, 593 U.S. at 633 (cleaned up) (declining to decide this question); *cf.*
*Chalabi*, 543 F.3d at 728 (authorizing courts to "address[] the merits where doing so ma[kes] it
possible to avoid a doubtful issue of statutory jurisdiction" (cleaned up)).  And, given the
sparseness of Plaintiff's allegations, the Court also need not reach Defendants' argument that
"[e]ven if Plaintiff[] . . . pleaded specific facts" supporting his command-and-control theory, his
claims "still [would] not touch and concern the United States with sufficient force to overcome
the ATS's extraterritoriality bar."  Mot. at 28 (cleaned up).

*Better Env't*, 523 U.S. 83, 89 (1998) (explaining that a court lacks subject matter jurisdiction where a plaintiff lacks even an "arguable . . . cause of action").

Second, Plaintiff's Complaint does not state a plausible claim as to Mr. Goth.  Plaintiff makes no specific allegations about Mr. Goth's conduct—only a broad assertion that he, along with the other U.S.-based Defendants, helped track and target Somali Americans like Plaintiff's father.  For the reasons described above, the Court need not treat that conclusory allegation as true, and nothing else in Plaintiff's filings provides any basis—let alone a reasonable one—to "infer[] that [Mr. Goth] is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  The Court therefore dismisses this claim under Rule 12(b)(6).

### E.     The Court Will Allow Plaintiff to Move for Leave to File a Third Amended Complaint.

For all the foregoing reasons, this case cannot move forward based on the current Complaint.  Defendants argue that this should be the end of things: in their view, Plaintiff has had ample opportunity to present his claims, and he "should not be permitted to impose further on [Defendants] and the court system."  Dkt. 45 at 6 (cleaned up).  There is some force to that view; Plaintiff has already amended his pleading twice and has submitted a string of filings in response to Defendants' Motion, all of which the Court has considered.

But, mindful of its obligation to treat *pro se* litigants with "solicitude," *Kim*, 840 F. Supp. 2d at 191, and of Plaintiff's contention that he could, if necessary, provide additional facts in support of his claims, Dkt. 44 at 3, the Court will give Plaintiff one final opportunity to move for leave to file a third amended complaint.

To minimize the burden on Defendants, if Plaintiff files such a motion, the Court will evaluate whether the proposed pleading survives the arguments advanced in Defendants' briefing thus far, whether addressed in this Memorandum Opinion and Order or not.  If the Court concludes

that the current briefing already warrants dismissal, the Court will deny the motion and dismiss this case. If the Court requires further analysis from the parties, it will set a status conference.

## IV.    CONCLUSION AND ORDER

The Court offers Plaintiff its sincere condolences for the loss of his father. But his current allegations are too speculative or disconnected from this forum for this case to move forward. The Court therefore

**GRANTS** Defendants' Motion to Dismiss, Dkt. 34. The Court

**DISMISSES** Plaintiff's Second Amended Complaint, Dkt. 31-1, without prejudice.[10] And the Court

**ORDERS** that Plaintiff may, on or before September 30, 2024, move for leave to file a third amended complaint that cures the deficiencies identified in this Memorandum Opinion and Order. If Plaintiff files such a motion, the Court will assess whether further analysis from the parties is necessary and, if so, set a status conference. If Plaintiff does not so move, the Court will enter a final appealable Order dismissing this case without prejudice.

**SO ORDERED.**


Date:   August 29, 2024                                   _____

                                                         ANA C. REYES
                                                         United States District Judge

---

[10] This dismissal operates without prejudice both because the Court will allow Plaintiff to move for leave to file a third amended complaint and because the dismissal is on a combination of jurisdictional grounds, *see Havens v. Mabus*, 759 F.3d 91, 98 (D.C. Cir. 2014) (explaining that jurisdictional dismissal should operate without prejudice), and for pleading deficiencies that Plaintiff could cure by alleging additional facts consistent with those set forth in the Complaint, *see Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 131 (D.C. Cir. 2012) ("[D]ismissal with prejudice is warranted only when a trial court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." (cleaned up)). The Court notes that dismissal without prejudice would also have been required had it dismissed the case based on Defendants' immunity arguments. *See Havens*, 759 F.3d at 98.